**Margo GATHRIGHT–DIETRICH and Bonnie Bonham, Plaintiffs,**

v.

**ATLANTA LANDMARKS, INC. a/k/a The Fox Theatre, Defendant.**

No. 1:02–CV–1978–WSD.

United States District Court,
N.D. Georgia,
Atlanta Division.

June 30, 2005.

Judith A. O'Brien, Shannon L. Kimball, Sutherland Asbill & Brennan, Atlanta, GA, for Plaintiff.

Ashley D. Brightwell, Robert Steven Ensor, Alston & Bird, Atlanta, GA, for Defendant.

## ORDER

DUFFEY, District Judge.

This matter is before the Court on Defendant Atlanta Landmarks, Inc. a/k/a The Fox Theatre's (hereafter "The Fox") Motion for Summary Judgment [53], Plaintiffs Margo Gathright–Dietrich's and Bonnie Bonham's (hereafter collectively "Plaintiffs") Brief in Opposition to The Fox's Motion for Summary Judgment ("Pls.' Opp'n") [74], The Fox's Reply Brief in Support of its Motion for Summary Judgment [82], Plaintiffs' Motion for Leave to File Confidential Statement of Additional Facts in Dispute Under Seal [72] and Plaintiffs' Motion to Supplement Expert Report of James L.E. Terry [104].

## I. INTRODUCTION

This action is brought by two wheelchair-using individuals against The Fox Theatre. Plaintiffs allege The Fox violates Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12182, et seq. (the "ADA"), in a number of particulars ranging from the seating provided by The Fox for wheelchair patrons to the sale of tickets to them.[1] Defendant moves for summary judgment on Plaintiffs' claims on the grounds that The Fox, a facility which existed on the effective date of the ADA, complies with the requirements of the ADA relating to wheelchair patrons.

## II. FACTUAL BACKGROUND

### A. The History Of The Fox Theatre

The Fox Theatre has a long and distinguished history in Atlanta. It was designed in the late 1920's as the headquarters for the Shriner's organization and was in the late 1920's leased to movie-mogul William Fox. The theater closed in 1932, but underwent a revival beginning in the 1940's when it began operating as the premier movie house in Atlanta. In the 1970's, the facility again experienced economic difficulties, and, early in that decade, it was considered for purchase as the site for Southern Bell Company's[2] regional headquarters. The proposed sale gave rise to a significant community effort to preserve the facility. In 1974, the "Save the Fox" campaign, orchestrated by Atlanta Landmarks, Inc., a not-for-profit entity, resulted in the preservation of the theater.

Since 1974, The Fox has served Atlanta as a multi-purpose performing arts and entertainment center hosting movies, concerts, dance performances and other events. The Fox contains significant historic features ranging from its seating configuration, to its simulated night-sky ceiling, to its faux-painting techniques, to its original DC current-run elevators with AC converters.[3] While it has served this role, Atlanta Landmarks, Inc., has worked to maintain and preserve the historic features

---

1. Plaintiffs have filed their Motion for Leave to File Plaintiffs' Confidential Statement of Additional Material Facts in Dispute Under Seal [72]. The motion was filed to comply with the Confidentiality Order entered in this case. The Confidential Statement of Additional Material Facts contains information designated by Defendant as confidential. The public is entitled to know the information upon which the Court reached the decision reflected in this Order. Public access to the litigation process instills public confidence and trust in our court system. The Court sparing allows information submitted to support dispositive motions or introduced at public proceedings to be maintained as confi-

dential. Information that is allowed to be maintained as confidential usually is information the disclosure of which would violate an individual's privacy or a company's proprietary commercial interests. The information sought to be filed under seal here does not rise to that level, and thus the motion is denied.

2. Southern Bell was, at the time, the local wireline telephone service provider for the region.

3. Plaintiffs challenge the historical significance of the theater, pointing to certain

of the theater and The Fox is regularly compared to nationally recognized historic theaters. Its historic importance is characterized by the designations it has received. In 1974, it was listed in the National Register of Historic Places, and in 1976 it was designated by the federal government as a National Historic Landmark. Only about three percent (3%) of all buildings on the National Register of Historic Places are designated as National Historic Landmarks, the highest historical designation for private property in our country. In 1991, The Fox was designated a Landmark Museum Building by the Georgia Department of Natural Resources Historic Preservation Officer. The building, however, was not preserved to be a static monument to the past. Citizens, businesses and governments collaborated financially and philosophically to ensure The Fox was maintained as an operating arts venue, allowing public audiences to enjoy a variety of events in a unique, historical setting. The nature and uniqueness of The Fox is what gives rise to this lawsuit. Plaintiffs, undisputed patrons of the arts, claim they and other wheelchair patrons are denied access to events at The Fox comparable to the access given to non-wheelchair patrons. On one level, they complain that certain areas designated for wheelchair pa-

trons are physically inaccessible to them and that this denial—as to some seating and some concession areas—is complete. On another level, their complaint is that the quality of their access is inferior—such as the absence of shoulder-to-shoulder companion seats and the fact wheelchair-designated restrooms lack the decor and ambiance of restrooms available to the public generally—which degrades their experience at the theater. The Court understands the continuum of Plaintiffs' complaints and is required to evaluate them in the context of the prohibitions of the ADA.

## B. Wheelchair Modifications

The Fox has made a number of modifications to the theater to improve access for wheelchair patrons.[4] These changes began to be made around 1985 and included designating and modifying certain seats for wheelchair patrons. The Fox also installed an elevator which, among other purposes, could be used by wheelchair patrons to access the theater's ballrooms, installed a box office with a lower window and shelf for use by wheelchair patrons, installed a wheelchair-accessible telephone, installed four single-user restrooms for wheelchair patrons, provided a wheelchair-accessible concession counter, and installed an access ramp to the stage.[5] In approxi-

changes that have been made to it. Their objections include that certain rows of seats were removed to accommodate equipment and other seats can be removed from Rows V, W and X. The equipment for which seats were removed is not identified by Plaintiffs and they do not point to evidence as to when or why seats in Rows V, W and X have been removed. (Pls.' Am. Statement of Material Facts [98] ¶¶ 10–12). In further support of Plaintiffs' claim that Defendant has not preserved the historic nature of the theater, Plaintiffs even point to the removal of seats to provide wheelchair seating in the rear of the orchestra level. (Id.) There is no evidence of such significant changes to the theater so as to abandon its historical significance, as evi-

denced by the fact it maintains its historic designations.

4. The parties agree The Fox has made certain modifications to the theater intended to facilitate wheelchair patrons access to the theater. Plaintiffs contend that virtually all of these modifications are inadequate individually and collectively for The Fox to comply with the ADA. Plaintiffs' litigation addresses alleged architectural barriers in the theater as modified by Defendant. (See, e.g., Pls.' Opp'n at 7, 13.)

5. Plaintiffs argue that each of these additions to the theater do not comply with the Standards for Accessible Design, 28 C.F.R. pt. 36, app. A (1994) (the "Standards"), and thus

mately 1996, The Fox started what it calls its "Ambassador Program," consisting of volunteer ushers who are responsible, in part, for accommodating and assisting disabled, including wheelchair, patrons. The Fox states that during a show there are approximately eight ambassadors on duty although the number varies from show to show.[6]

### C. *Wheelchair Seating*

The Fox has at least fifteen (15) to eighteen (18), and sometimes as many as twenty-five (25), wheelchair seating positions with companion seats in the orchestra level of the theater. The number of seats available at any given event depends on whether the orchestra pit area is used for seating. Seventeen of the wheelchair locations are on a level, or near level grade floor. Plaintiffs claim the seating available does not meet the requirements of the Standards and constitutes a "barrier" for wheelchair patrons because it either offers obstructed views, the viewing angles are unacceptable, the seats are segregated from the general public, the seats are not of sufficient size, they do not offer acceptable companion seating, or the seating is not in desirable areas of the theater. The Fox states that the demand for wheelchair seating has not exceeded the number of seats available. Plaintiffs claim if the seats met the Standards, then demand would exceed availability.

### D. *Other Facilities*

The Fox claims a wheelchair-accessible public-pay telephone is available in the Spanish Room on the orchestra level, and accessible house phones are located in the men's and women's lounges on the mezza-

nine level. Plaintiffs claim there are no accessible telephones of either type in the theater. Plaintiffs deny the wheelchair ticket window installed by The Fox is accessible because it does not meet the Standards. Plaintiffs also dispute that the seven wheelchair-accessible restrooms claimed by The Fox are in fact accessible to wheelchair patrons. Plaintiffs claim the restrooms do not meet the Standards, are not decorated in the same manner as others available in The Fox, are separated from the restrooms available to other patrons, that signage for the restroom locations is not "high contrast" and is not visible if doors to the ballroom are closed, and generally that the restrooms are required to be enhanced to comply with the Standards. Because the restrooms do not meet the requirements of the Standards, Plaintiffs claim they are barriers to wheelchair patrons.

Regarding the concession area for wheelchair patrons in the Spanish Room, Plaintiffs submit it does not meet the Standards. With respect to the wine bar and merchandise area on the orchestra level, Plaintiffs claim a full selection is not available at the location. Regarding the mezzanine concession area, Plaintiffs claim that because it was constructed as part of a renovation project in the mid–1990's it was required to be, but was not, constructed in compliance with the Standards and that the elevator to travel to the mezzanine level is not always manned and available, and thus this attempt to provide wheelchair patrons access to the mezzanine concession areas does not remove architectural barriers to concession facilities.

---

continue to constitute "barriers" to wheelchair patrons. The Court later discusses the requirements of the ADA, whether The Fox has violated them, and whether there are issues of material fact required to be decided by a jury.

6. Plaintiffs claim the Ambassadors have not treated them well, that they do not like how Ambassadors interact with them and that they are not always available to help.

### E. *Ticketing*

The Fox claims it provides tickets to wheelchair patrons at prices that are comparable to or better than those offered to the public. Plaintiffs claim pricing is not comparable because wheelchair seating is not in compliance with the Standards, that they cannot purchase directly from Ticketmaster as other patrons may, and that it is inconvenient or difficult to deal with those at The Fox responsible for selling tickets to wheelchair patrons.[7]

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir.1999). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir.1999). The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." *Id.*

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor. *United of Omaha Life Ins. Co. v. Sun Life Ins.*

*Co. of Am.*, 894 F.2d 1555, 1558 (11th Cir.1990). "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury...." *Graham*, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Herzog*, 193 F.3d at 1246. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### B. *The Americans With Disabilities Act*

The Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101–12213 (1994), is comprehensive legislation which addresses discrimination against disabled individuals. The Act has three sections: Title I regulates discrimination in the workplace; Title II prohibits discrimination by public entities; and Title III prohibits discrimination by private entities in places of public accommodation. Title III applies in this litigation.

Title III provides:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182. Facilities constructed after January 25, 1993,[8] have to meet exacting design and implementation stan-

---

7. Plaintiffs have contested virtually every modification or service cited by The Fox to address wheelchair patron access and to ad-

dress the needs of these members of its customer base.

8. This is the date of enactment of the ADA.

dards to meet the requirements of the ADA to accommodate wheelchair-bound as well as other disabled persons. The ADA imposes different requirements on the owners and operators of facilities which existed on January 25, 1993. The Act states that discrimination includes a private entity's "failure to remove architectural barriers ... in existing facilities ... where such removal is readily achievable." *Id.* § 12182(b)(2)(A)(iv). Where it is not "readily achievable" to remove a barrier, failure of the entity to make goods, services and facilities "available through alternative methods if such methods are readily achievable," may constitute discrimination under the ADA. *Id.* § 12182(b)(2)(A)(v).

"Readily achievable," the phrase that is often the focus of an ADA-compliance analysis of an existing facility, is defined as "easily accomplishable and able to be carried out without much difficulty or expense." *Id.* § 12181(9). Congress included in the ADA factors to be considered in evaluating whether removal of a barrier is "readily achievable." The factors are: (1) nature and cost of the action; (2) overall financial resources of the facility or facilities involved; (3) number of persons employed at such facility; (4) effect on expenses and resources; (5) impact of such action upon the operation of the facility; (6) overall financial resources of the covered entity; (7) overall size of the business of a covered entity; (8) the number, type, and location of its facilities; (9) type of operation or operations of the covered en-

tity, including composition, structure, and functions of the workforce of such entity; and (10) geographic separateness, administrative or fiscal relationship of the facility or facilities in question to the covered entity. *Id.*[9]

■ Which party is required to carry the burden of proof on the issue of what constitutes a barrier and whether removal of it is readily achievable is not addressed in the statute, but it has been evaluated in several cases. The courts which have addressed the burden of proof issue generally agree that the plaintiff has the initial burden of production, that is, of presenting evidence that a barrier exists, and "evidence tending to show that the suggested method of barrier removal is readily achievable under the particular circumstances. If Plaintiff does so, Defendant then bears the ultimate burden of persuasion that barrier removal is not readily achievable...." *Colorado Cross Disability Coalition v. Hermanson Family Ltd.*, 264 F.3d 999, 1002–03 (10th Cir.2001); *Access Now, Inc. v. South Florida Stadium Corp.*, 161 F.Supp.2d 1357, 1363–65 (S.D.Fla. 2001); *Ass'n for Disabled Ams. v. Claypool Holdings LLC*, No. IPOO–0344, 2001 WL 1112109, at *26 (S.D.Ind. Aug.6, 2001). Thus, an analysis of the available cases, the applicable regulations and a textual review of the statute itself provides an overall analytical framework which applies here.[10]

---

9. Legislative history evidences Congress intended to impose a minimal obligation on existing facilities. The "readily achievable" criteria for barrier removal in existing facilities "allows for minimal investment with a potential return of profit from use by disabled patrons, often more than justifying the small expense" of barrier removal. S.Rep. No. 101–116, at 66 (1989).

10. The Eleventh Circuit has not considered this burden issue. However, the burden-shift-

ing approach discussed in *Colorado Cross* is sound and supported by this Court's critical review of the burdens imposed by subsections (i) and (ii) of § 12182(b)(2)(A), and their apparent provision of an affirmative defense for a private entity to demonstrate that compliance would alter the goods and services provided. *Id.*; *see Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir.1997). The Department of Justice implementing regulations also suggest the burden-shifting approach discussed here.

■ Under this analytical scheme, the plaintiff has the initial burden of production to show (1) that an architectural barrier exists; and (2) that the proposed method of architectural barrier removal is "readily achievable," *i.e.*, "easily accomplishable and able to be carried out without much difficulty or expense" under the particular circumstances of a case. *Colorado Cross*, 264 F.3d at 1007. To meet the burden of production a party must "introduce enough evidence on an issue to have the issue decided by the fact-finder, rather than decided against the party in a peremptory ruling such as a summary judgment or a directed verdict." Black's Law Dictionary 190 (7th ed.1999); *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (finding burden of production satisfied by introduction of evidence sufficient to permit a conclusion on an issue favorable to the party who has the burden).[11] Only when this burden is met is the defendant required to assume the burden of persuasion that a barrier does *not* exist and removal is *not* readily achievable.

While the burden scheme is clear, what must be shown to meet the burden is murky. The parties have significantly different views on what is a "barrier," and do not discuss in much detail what "readily achievable" means. These issues must first be resolved.

### 1. *What is a barrier?*

The parties disagree on how to determine what is a barrier. Plaintiffs argue the Court is bound by the following analysis:

> In determining whether any barriers exist, two sources of authority control: first and foremost is the statute itself; second are the ADA's implementing regulations, particularly the Standards for Accessible Design, 28 C.F.R. pt. 36, app. A (2004) ... which have been adopted by the Department of Justice....

(Pls.' Opp'n at 3.) Plaintiffs reduce this analysis by stating the Court must "consider any element in [an existing] facility that does not meet or exceed the requirements set forth in the Standards to be a barrier to access." (Pls.' Opp'n at 4.)[12]

---

**11.** The evidence considered on a motion for summary judgment must be admissible at trial. *Macuba v. Deboer*, 193 F.3d 1316, 1322–24 (11th Cir.1999).

**12.** Plaintiffs cite *Pascuiti v. N.Y. Yankees*, 87 F.Supp.2d 221 (S.D.N.Y.1999), as authority for this proposition. The Court in *Pascuiti* referenced a 1998 letter authored by an Assistant United States Attorney in the United States Attorney's Office for the Southern District of New York (the "AUSA letter"), for the proposition that: "Under the ADA, existing facilities are obligated to bring their facilities as close to compliance with the Standards as is readily achievable." Plaintiffs argue "those elements of an existing facility that do not meet or exceed the ADA Standards represent barriers that must be removed if doing so is readily achievable." The court, however, refused to adopt this standard, stating only that "plaintiffs are allowed to compare facilities ... with the requirement laid out in the Standards as part of their effort to establish" alleged barriers. *Id.* at 226. The court essentially said the Standards may only be used as a guide.

Plaintiff also relies on the Eleventh Circuit's decision in *Kornblau v. Dade County*, 86 F.3d 193 (11th Cir.1996), for the proposition that the AUSA letter, the DOJ's interpretation of the ADA and its regulations are entitled to substantial deference. (Pls.' Opp'n at 5.) The Eleventh Circuit in *Kornblau* said "Regulations promulgated by the Department of Justice interpreting the ADA are, of course, entitled to considerable weight." 86 F.3d at 194. The regulations do not state that the Standards apply to existing facilities and the Court of Appeals in *Kornblau* stated "the regulations cannot require more than a reasonably interpreted Act can require." *Id.* While the Regulations may be viewed as a statement of the Department of Justice's interpretation of the ADA, a letter from an Assistant United States Attorney, in a local United States Attorney's Office, does not.

Defendant urges a different approach. It claims the Court may "look to the Standards for guidance in determining whether a condition at an existing facility constitutes an architectural barrier, [but] the Standards are not controlling and a court may consider other factors, such as consumer demand, in assessing whether a barrier exists." (Def.'s Br. in Support of Mot. for Summ. J. at 4.) [11] The Court has evaluated these respective positions, both of which have some merit. Based on the language of the ADA, the purpose of the Standards and the cases which discuss barriers in existing facilities, the Court concludes a "barrier" under the ADA should be determined using the Standards as a guide. However, it is clear the Standards are not intended to prescribe what must be done to address an alleged barrier in a facility that existed at the time the ADA was passed. They are to be used as a guide, not a requirement. It is well settled that:

> The ADA establishes different standards for existing facilities and new construction. In existing facilities, where retrofitting may be expensive, the requirement to provide access is less stringent than it is in new construction and alterations, where accessibility can be incorporated in the initial stages of design and construction without a significant increase in cost.

ADA Title III Technical Assistance Manual, U.S. Department of Justice (1993) (the "Technical Assistance Manual") at 31; *Access Now, Inc.,* 161 F.Supp.2d at 1368. The test the Court will apply in this case, therefore, is: does the alleged barrier, under the circumstances of a particular case, actually or effectively preclude a wheelchair patron from using an existing facility on terms sufficiently comparable to non-wheelchair patrons?

### 2. *What is "readily achievable"?*

The parties have not discussed in detail what is required to show that removal of a barrier is "readily achievable." Plaintiffs, however, must make a sufficient showing that barrier removal is readily achievable to avoid summary judgment and meet their burden of production. Plaintiffs acknowledge the ADA defines "readily achievable" as "easily accomplishable and able to be carried out without much difficulty or expense." 42 U.S.C. § 12181(9). Plaintiffs argue further that "Defendant bears the ultimate burden of proof to show that Plaintiffs' suggested methods of barrier removal are not readily achievable." (Pls.' Opp'n at 14.) Plaintiffs contend that whether removal of a specific barrier is readily achievable is "a fact-intensive inquiry," which, in this case, is not suitable for summary judgment. (*Id.*) At its core, Plaintiffs' argument is, irrespective of how you approach the issue of "readily achievable" barrier removal, it is so fact intensive an issue in this case that summary judgment cannot be granted.

Defendant agrees that "easily accomplishable and able to be carried out without much difficulty or expense" is the applicable definition. It argues the regulations provide various criteria for evaluating whether removal is readily achievable. (Def.'s Br. in Support of Mot. for Summ. J. at 12.) It also argues that barrier removal is not readily achievable if it would threaten the historical significance of a building. (*Id.* at 13.) Finally, Defendant claims Plaintiffs have the burden initially to present evidence showing removal is readily achievable, and that

---

**11.** Defendant argues a barrier cannot exist if no wheelchair patron was turned away from The Fox. This argument cannot be relevant without first evaluating whether The Fox has seating in which wheelchair patrons can be accommodated, that is, seating which does not present a physical barrier to attendance of events.

summary judgment is appropriate, especially here, where Plaintiffs have not met their burden of production that removal of the alleged barriers is readily achievable. Defendant claims Plaintiffs failed to provide evidence sufficient to show the cost of barrier removal or the economic impact of removal to The Fox.

 The Court has reviewed the ADA, its implementing regulations and the cases which discuss whether removal of an alleged ADA barrier is "readily achievable." This review, especially the language of the statute, teaches there are three criteria to evaluate whether removal is "readily achievable": (1) whether removal can be done without difficulty—is it, as a practical matter, easily accomplished; (2) whether removal can be achieved without significant cost; and (3) whether removal can be carried out without significant economic or operational impact. *See* 42 U.S.C. § 12182(b)(2)(A)(iv). The § 12181(9)(A–D) criteria themselves evidence what must be shown. Taken together, the factors put considerable emphasis on the business effect of removal, especially the cost of removal and the economic and operational impact of removal of the alleged barrier. Cost and economic and operational impact are driving criteria in determining if removal can be readily achieved. In fact, half of the factors involve the consideration of the cost or economic impact of removal. The remaining five factors similarly require an operational-impact analysis which necessarily intersects with the cost and economic impact analysis also required. *See Spector v.*

*Norwegian Cruise Line Ltd.,* 545 U.S. 119, 125 S.Ct. 2169, 2180, 162 L.Ed.2d 97 (2005) (cost of removal is a factor in addition to other factors tending to show the removal "easily accomplishable and able to be carried out without much difficulty or expense"). To give this analysis more practical meaning in this case, the Court finds Plaintiffs, to meet their burden of production to demonstrate removal is "readily achievable," must present evidence of: (1) a specific design to remove the barriers alleged; (2) the cost of removal or of the proposed remedy; and (3) the effect on the finances and operation of the facility. *Colorado Cross,* 264 F.3d at 1009. A conclusory statement that a recommendation to remove an ADA barrier can be easily accomplished without much difficulty or expense is insufficient for Plaintiffs to meet the burden of production on the issue of "readily achievable." *See Access Now, Inc.,* 161 F.Supp.2d at 1371 (statements that are the result of speculation or conjecture or which are merely conclusory are insufficient). If Plaintiffs make this showing then the burden shifts to the Defendant to prove, by a preponderance of the evidence, that removal is not readily achievable.

### C. *Specific Alleged Barriers*

As discussed above, Plaintiffs have the initial burden of production to show both the existence of an architectural barrier and that its removal is readily achievable.[12] Plaintiffs allege that several architectural barriers that violate the ADA exist at The Fox.[13] Each of these are discussed below.

---

**12.** Plaintiffs allude to an argument that certain "renovations" were made to The Fox and that such renovations were required to adhere strictly to the Standards. Plaintiffs, however, have not articulated the renovations, other than to refer to changes in the mezzanine area. Plaintiffs have not presented evidence to show that any renovation was of a nature to require it to meet the requirements for new construction and thus the Court does not address this issue. The Court does evaluate the changes made to the concession area on the mezzanine level to accommodate wheelchair patrons.

**13.** Defendant challenges Plaintiffs' standing to pursue their claims under the ADA. The Complaint evidences Plaintiffs' concerns in

## 1. *Seating*

Plaintiffs' Complaint alleges that The Fox seating constitutes an architectural barrier. The shortcomings alleged fall into seven areas: adequacy of the number of seats designated, accessibility, line of sight, integration and dispersal, characteristics of the seating locations, availability, and pricing and sales. Each alleged barrier is dealt with separately.

### a. *Adequacy of the number of seats designated*

Plaintiffs claim the number of seats available for wheelchair patrons for performances and events at the theater is inadequate and thus constitutes a barrier under the ADA. Plaintiffs rely on the Standards in arguing that a theater the size of The Fox is required to have forty-five (45) wheelchair seats. Plaintiffs argue further that The Fox is required by the Standards to have an "additional 1% of all seats be aisle seats with removable, folding, or no armrests on the aisle side to allow wheelchair users to transfer into them," or for those who use other "mobility assistance devices." (Expert Report of James L.E. Terry, Am.App. in Supp. of Pls.' Statement of Facts [99], Ex. 19 at 4.) Based on these criteria, Plaintiffs claim The Fox is required to add between twenty-seven (27) to thirty (30) (depending on performance set-up) wheelchair-accessible seats and thirty-six (36) aisle-transfer seats to remove barriers in the theater.

Plaintiffs' strict reliance on the Standards to determine what changes must be made to an existing facility is misguided. Plaintiffs' Standards-based analysis necessarily allows them to avoid the circumstances-based analysis required under the ADA when existing facilities are at issue. What is required here, using the Standards only as a guide, is to determine if the number of seats constitutes a barrier.[14] Defendant only provides between fifteen (15) to eighteen (18) seats. Using the Standards as a guide, this disparity is sufficient to present an issue of fact whether a barrier exists with respect to the number of seats required. For these reasons, the Court finds Plaintiffs have met their burden to show the number of wheelchair seats available in the facility constitutes a barrier.

██ However, even if the number of seats constitutes an impermissible barrier, Plaintiffs have not produced any reliable evidence that barrier removal is readily achievable. The record is devoid of evidence to support Plaintiffs' burden on this issue. Mr. Terry, Plaintiffs' expert, does not produce any evidence in his report and his deposition testimony to satisfy Plain-

---

this case focus on alleged barriers to access for wheelchair-bound patrons of The Fox. The undisputed facts demonstrate Plaintiffs are patrons of The Fox and require the use of wheelchairs. Plaintiffs, therefore, have standing to pursue their claims. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To the extent Plaintiffs complain of barriers to patrons with disabilities other than those suffered by Plaintiffs, such claims are not presently before the Court and if they were it is doubtful that Plaintiffs would have standing to assert them.

**14.** Plaintiffs' strict Standards-based analysis essentially ignores the ADA and Congress' expressed policy that existing facilities are to be treated differently. The practical impact of the analysis Plaintiffs claim is required is to impose a burden on a defendant to prove that it cannot convert an existing facility to the same exacting specifications required of post-January 25, 1993 new construction. The ADA and the cases construing Title III in cases of existing facilities clearly do not impose the burden demanded by Plaintiffs. If Plaintiffs' argument was accepted, its burden of production would, as a practical matter, always be met because a plaintiff always could show existing buildings do not meet the Standards, and then could make conclusory allegations that it would not be difficult or expensive to meet them.

tiffs' burden of production on whether the removal of this seat-number barrier is readily achievable. His report contains a section entitled "Possible Solutions to Non-compliant Wheelchair Seating." (Expert Report of James L.E. Terry at 25–30.) In it he lists only three solutions. First, he states compliant wheelchair seating locations could be provided on the orchestra level in three locations—the orchestra pit, the first few rows of seats before the floor begins sloping upward and the existing row *OO*. What he suggests be done is unspecific, stating for the orchestra pit: "removal and/or relocation of folding chairs to make enough room for wheelchairs." (*Id.* at 26.) Regarding the first few rows before sloping begins, he suggests "removing enough existing standard seats to make room for wheelchairs and companion seating" in the area. (*Id.* at 27.) He concludes by suggesting "removing the low platform and folding chairs behind the current wheelchair positions to provide the required accessible route and maneuvering space." (*Id.*) Plaintiffs provide no cost or economic impact evidence, relying only on Terry's general conclusory statements that his suggestions are "low-cost" or "inexpensive." [15] These general, conclusory statements on the solutions recommended and the cost and economic or operational impact of barrier removal is legally insufficient to meet Plaintiffs' burden of production on the readily achievable barrier removal issue.[16]

Plaintiffs' next offered solution is to construct "New Inset sections" requiring the removal of "all or a portion of 3 rows of standard seats and modifying a section of the floor to create a level, inset plat-

form...." (*Id.*) Terry states the floor modification would require a series of small columns and shallow beams to be added to the plenum under the new platforms, the beams having to be six to ten inches deep. (*Id.* at 28.) Although a bit more specific information is provided regarding what might be done to implement this solution, including a diagram of a "typical platform" in a theater, where these insets could be constructed at The Fox is not provided nor is the total number of inset seats discussed. Conspicuously absent is any cost information. Although Terry states this option is "more expensive than any of the other options I am suggesting," he does not offer any evidence of the estimated cost of the solution. (*Id.* at 28.) He offers only his general conclusion that the solution is "considered readily achievable for a facility of this type and size." (*Id.*) No impact information is provided. These general statements and conclusions are legally insufficient to meet Plaintiffs' burden of production.

Finally, Plaintiffs offered a "new raised platform" solution. Mr. Terry states this solution would be implemented at the "rear and sides of the theater and might also be possible in other locations if a new cross aisle was created by the removal of existing seating near the front." (*Id.* at 29.) Terry states this solution is "feasible and readily achievable." (*Id.*) This unspecific suggested solution without supporting cost or operational impact information is not sufficient to meet Plaintiffs' burden of production.

A plaintiff must present sufficient evidence so that a defendant can evaluate the

---

**15.** Very little evidence has been offered by Plaintiffs to show on the facts here whether there are sufficient seats to satisfy the wheelchair patron demand. They have offered one Plaintiff's personal account of seating being unavailable to her for an event, but Plaintiffs do not present evidence of demand for seats for that event.

**16.** Mr. Terry's testimony at his deposition was similarly vague and conclusory. (*See, e.g.,* Terry Dep. at 299, 327.)

proposed solution to a barrier, the difficulty of accomplishing it, the cost implementation, and the economic impact on the operation of the facility.[17] Only with evidence on these issues can a defendant determine if it can meet its subsequent burden of persuasion on this issue. The fact is Plaintiffs' seating solutions here do not provide any evidence of the number of seats lost, the number of wheelchair and companion seats gained, where they would be located, what it would cost to implement them or what effect they could have economically or operationally on the theater. Plaintiffs' "evidence" of the proposed solutions and whether they are readily achievable falls well short of what is required to meet their burden of production in this case.

### b. *Accessibility of seating*

■ Plaintiffs argue that the seats The Fox has designated for wheelchair patrons are not accessible, nor are they integrated with non-wheelchair seating or proportionately dispersed throughout the theater. First, Plaintiffs argue the wheelchair-designated seats in Row V and at the end of Rows S, U, W and Y, do not meet the Standards with regard to the slope of the seating area. Specifically, Plaintiffs' expert has stated "the Theatre's existing wheelchair positions fail to meet the slope requirements set forth in the Standards." (Expert Report of James L.E. Terry at 7.) Plaintiffs argue the Standards permit only a two percent (2%) slope for seating. Plaintiffs have presented evidence that the slopes for the wheelchair-designated seating in aisles S, U, V, W, and Y are more than twice the slope requirement of the Standards. (*Id.*) Using the Standards as a guide, the Court finds these slopes are not reasonable and the seats in these rows constitute architectural barriers. Plaintiffs have presented proposed design solutions to address the alleged slope deficiencies. Absent again, however, is evidence of the cost to implement the solution proposed, the economic impact of the seating reconfiguration or its effect on theater operations. Plaintiffs therefore have failed to meet their burden of production on the issue of the accessibility of seating.

### c. *Line of sight.*

■ Plaintiffs next present evidence that sight lines at Rows *OO*, A, BBB, and the side aisle locations at Rows S, U, W and Y, are inferior to those available to the general public because they are obstructed or the viewing angles are extreme. Specifically, Plaintiffs assert the views from seats in the side aisles and in Row A are obstructed by the proscenium and sometimes by equipment on stage. They claim the sight lines from Rows BBB and A are extreme and that Row OO is the seating area farthest from the stage and otherwise is impacted by noise from the mezzanine.[18] However, the seats referenced by Plaintiffs, except these in Row OO, are immediately adjacent to seats sold to and used by members of the general public. The seats in Row OO, while apparently the seats farthest from the stage, are directly behind seats sold to and used by the general public. The evidence cited by Plaintiffs, based on Terry's opinion, appears to stand

---

**17.** Defendant has expended approximately $530,000 to date on changes to accommodate wheelchair patrons and an additional $708,000 to construct an elevator to the Egyptian Ballroom and Grand Salon, which was constructed in part to provide wheelchair access to these areas. These amounts, which total $1,238,000, underscore that cost and economic impact information is essential to show whether a proposed solution is readily achievable.

**18.** Although there is little authority that defines line of sight, this Court finds the Fifth Circuit's definition of "unobstructed view" as reasonable. *Lara v. Cinemark USA, Inc.,* 207 F.3d 783, 789 (5th Cir.2000).

for the proposition that even if line of sight for wheelchair patrons is the same as for non-wheelchair patrons, an ADA barrier exists. There is no evidence offered by Plaintiffs that the wheelchair seats offer inferior lines of sight to seats for non-wheelchair patrons immediately adjacent to them. Furthermore, Plaintiffs offer no evidence to evaluate whether the removal of this barrier is readily achievable. Thus, Plaintiffs have not met their burden of production on whether line of sight at the wheelchair seats available at the facility constitutes an ADA barrier, removal of which is readily achievable.

### d. *Integration and dispersal*

■ Plaintiffs claim the Standards require that wheelchair seating be integrated within the seating offered to non-wheelchair patrons and that it be dispersed throughout the theater. The claim is that the wheelchair area at the rear of the main theater level fails to meet the Standards. Seats for wheelchair patrons, unlike non-wheelchair patrons, must for safety reasons be accessible to exits and must not hinder the exit of patrons in the event of an emergency. The seating designated by Defendant for wheelchair patrons is near exits and in locations where wheelchair exits will not hinder the exit of other patrons. The current location scheme does not create an ADA barrier. Even if the current dispersal of wheelchair seats in the theater constitutes a barrier, Plaintiffs have not presented evidence of the cost to implement a change to the current seating scheme or the economic or operational effect of any change which might be implemented.

### e. *Characteristics of seating locations*

■ Plaintiffs assert the folding chairs for companions accompanying wheelchair patrons and the fixed-chair companion seats for the wheelchair seats on the aisle do not permit shoulder-to-shoulder seating as required by the Standards, and thus the seats constitute ADA barriers. Wheelchair patrons often must be accompanied to a facility by a companion and even when not required, wheelchair patrons should be allowed the company of companions at an existing facility. Plaintiffs' expert provides some information about what companion seating Plaintiffs contend must be made available under the Standards, but does not specify where it should be implemented, the cost of implementation or the economic impact. Thus, Plaintiffs have not presented sufficient evidence to meet their burden of production on this issue.

### f. *Availability*

■ Finally, Plaintiffs claim that most seats designated for wheelchair patrons are unavailable most of the time. Depending on the type of event or performance, Plaintiffs claim seats in certain designated areas are not available. Plaintiffs do not offer any empirical data to support this claim, relying instead on deposition testimony of Plaintiffs in which they cite one instance where one of the Plaintiffs claims she wanted to attend an event, but wheelchair seats were not available. The Court accepts their testimony as true; however, Plaintiffs are obligated to show more. Specifically, there must be some evidence presented that on these occasions the number of wheelchair seats generally was not adequate to accommodate wheelchair patrons' demand for that event, and that their exclusion was the result of discrimination and not market demand for tickets to the event that generally affected all patrons. Plaintiffs have failed to satisfy this burden.[19]

---

**19.** The evidence presented by The Fox is that the number of wheelchair seats available for performances at The Fox has always exceeded the demand of wheelchair patrons.

### g. *Pricing and sales*

Plaintiffs conclude with their general observation that wheelchair patrons are not given the same ticket price options given to other Fox patrons and that they must purchase tickets through The Fox and cannot use the more convenient Ticketmaster sales outlets.[20] Plaintiff Bonham admits, however, that The Fox has a variety of ticket prices for wheelchair patrons for seats at a variety of locations in the theater. (Bonham Dep. at 152–53.) She further acknowledges tickets are available from The Fox through the liaison it provides for disabled patrons. Plaintiffs' general criticisms, unsupported by other analysis or information, prohibit Plaintiffs from meeting their burden of production on this issue.[21]

### 2. *Restrooms*

■ Plaintiffs contend the restrooms available to wheelchair patrons are not compliant with the Standards and that the removal of the alleged barriers is readily achievable. Plaintiff Bonham admits, however, there are wheelchair-accessible restrooms on the orchestra level by the Spanish Room and four restrooms off the orchestra level in the office area. (Bonham Dep. at 158–59; Gathright–Dietrich Dep. at 103.) Plaintiffs complain, however, that the restrooms provided do not meet the technical requirements of the Standards[22] and are not of the same decor, ambiance or quality as those for other patrons. That there are restrooms available and that The Fox provides assistance to users of them, the Court finds, using the Standards as a guide, the restrooms do not constitute barriers. Assuming they did, Plaintiffs nonetheless have failed to provide any cost or economic and operational impact analysis of alternatives to the restroom facilities currently available to wheelchair patrons and thus have failed to meet their burden of production on this issue.[23]

**20.** The Court has only considered the evidence in the record in deciding this issue. However, the Court notes that accessible seating for disabled persons and their companions apparently is available through the Ticketmaster website.

**21.** Plaintiffs also argue that it is the combination of these seating factors that present a seating barrier to wheelchair patrons. The Court has aggregated these factors to determine if Plaintiffs have met their burden of production in this case. The Court finds they have not. Whether one takes the seating factors alone or in the aggregate, Plaintiffs have failed to present sufficient evidence to show that barrier removal can be achieved readily "without much difficulty or expense," or that the seating which is available is inadequate to accommodate the demand and constitutes an actual ADA barrier to patrons.

**22.** Plaintiffs' relentless reliance on the Standards as the defining criteria for barriers is illustrated by Terry's review of the restrooms at the theater. He finds the side-by-side roll toilet paper dispensers to be barriers, stating: New side-by-side roll toilet paper dispensers were added, however they were placed outside of the maximum reach to the far dispenser with the outside edge of the roll at 39″ from the rear wall. . . . The Standards require the outside edge of the dispenser to be no more than 36″ from the rear wall. (Terry Supp. Expert Report at 3 ¶ 6.) Terry again does not provide evidence that the device could have been affixed where the Standards require. Plaintiffs' blind reliance on strict Standards compliance is not consistent with the requirements of the ADA where existing facilities are concerned. Simply pointing to a failure to meet the Standards is not sufficient for Plaintiffs to meet their burden of production.

**23.** Terry acknowledges The Fox has modified restrooms to accommodate wheelchair patrons, but opines that because the changes do not cause the restrooms to comply strictly with the Standards, the restrooms still constitute barriers. This is not the test. Moreover, Terry does not present any evidence that strict compliance with the Standards is technically or financially feasible. For example, a steel support may have prohibited locating a restroom grab bar exactly at the location which the Standards require. This is a further ex-

### 3. *Concession areas*

■ Plaintiffs' claim of access to concession facilities centers on complaints that the facilities made available to wheelchair patrons are not comparable to the concessions available to other patrons. Plaintiffs appear to argue that this existing facility is required to provide access to wheelchair patrons at the same locations, under the same circumstances and with the same selection of items, as those available to other patrons. They, again, rely on strict compliance with the Standards. The Court finds, using the Standards as a guide, that the undisputed facts show that wheelchair-accessible concession areas are available and that what is available does not constitute a barrier to access. The Court finds that The Fox concession areas are accessible to wheelchair patrons and The Fox provides persons to assist wheelchair patrons to purchase concession items. (Bonham Dep. at 158; Gathright–Dietrich Dep. at 133.) Even if the concession areas were a barrier, Plaintiffs have again failed to provide evidence of the cost and economic impact of implementing changes, and thus fail to meet their burden of production on this issue. The failure of

Plaintiffs to provide the information required is illustrated by Terry's proposed solution to the concession "barriers" he alleges. Terry advocates the construction of a lift to allow wheelchair patrons to be transported from the main level to the Spanish Room so wheelchair patrons could use concession stands (which Terry claim would also have to be modified to meet the Standards) in that room. Terry states "A number of such lifts are available and some options allow the designer to completely tailor the look of the lift platform and side walls to match whatever design they develop. Installation of a lift like this is readily achievable for the Fox." (Expert Report of James L.E. Terry at 13.) This aspirational solution does not provide a specific design. There is no evidence of the "options" that would work or whether they would affect the historical character or designation of the theater.[24] Absent also is any cost, economic or operational impact information. The broad, general statements and conclusions offered by Plaintiffs are legally insufficient to meet Plaintiffs' burden of production.[25]

In summary, the Court finds that Plaintiffs have failed to meet their burden of

ample of Plaintiffs' unreasonable reliance on absolute compliance with the Standards for an existing facility as old as The Fox.

**24.** Plaintiffs have acknowledged, in addressing proposed barrier removal and whether it is readily achievable, that they must consider the impact on the historic character of the theater. Absent from the record, however, is any evidence on the question whether any or all of the solutions Plaintiffs propose will affect The Fox's historical character or its official designations. The only deference given to this issue by Plaintiffs is an occasional broad, unspecific comment by Terry that he does not believe what is proposed will affect the character or designation of The Fox as an historical structure. (*See, e.g.,* Expert Report of James L.E. Terry at 26; Terry Dep. at 304–05.)

**25.** To avoid summary judgment, the non-moving party must produce admissible evidence that evoke triable issues of fact. *Southern Card & Novelty, Inc. v. Lawson Mardon Label, Inc.,* 138 F.3d 869, 873–74 (11th Cir.1998). It is questionable whether an opinion expressed by Terry as to cost, economic or operational impact would even be admissible. He is not trained, educated or qualified to estimate costs or impact of design solutions. Furthermore, the general opinions he expresses, such as that a solution proposed is "readily achievable," is unsupported by the necessary factual predicate, and is the *ipse dixit* of the expert. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

production to show that architectural barriers exist at The Fox, or that removal of alleged barriers is readily achievable. On the undisputed facts before the Court, Defendants are entitled to summary judgment.[26]

### D. *The ADA Accommodations Implemented By The Fox*

Considering next Plaintiffs' claims from the perspective of what The Fox has done to comply with the ADA, the record further establishes that Defendant is entitled to summary judgment. The Fox contends it is entitled to summary judgment on the grounds that the accommodations it has made for wheelchair patrons at the theater are sufficient to satisfy the ADA. Plaintiffs respond by contending again that many of Defendant's accommodations are not sufficient because they do not comply with the Standards. To accept Plaintiffs' view would require an existing, historic facility such as The Fox, which attempts to accommodate those with disabilities, to comply fully with the Standards. This result is untenable because it eliminates the required distinction between existing structures and new construction. The DOJ Standards and Technical Assistance Manual provide general evaluation guidance which informs the Court's analysis, and the Court finds the undisputed evidence demonstrates that no reasonable jury could find The Fox does not comply with ADA.

The ADA sets forth specific minimum technical requirements for new construction and alterations to existing facilities. Failure to abide by them evidence intentional discrimination. *Ass'n for Disabled Ams., Inc. v. Concorde Gaming Corp.*, 158 F.Supp.2d 1353, 1362 n. 5 (S.D.Fla.2001). However, "[t]he Act imposes a less rigorous standard of compliance on 'existing facilities,' constructed before its enactment on January 26, 1993." *Access Now, Inc.*, 161 F.Supp.2d at 1362. "The compromise Title III makes is to require only *reasonable* modifications and *readily achievable* barrier removals or alternative methods, when the disabled are subjected to de facto discrimination in places of public accommodation." *Id.* (quotation and citation omitted).

What the Act envisions—the level of barrier removal that is reasonable and easily achievable—is suggested (1) by the Standards, even though compliance with them is not required, and (2) by guidance developed by the Department of Justice, the federal agency charged with enforcement of the Act. The information in these materials is instructive on the issues in this case.

■ The general standard is that "Public accommodations are required to remove barriers *only when it is 'readily achievable' to do so.*" Technical Assistance Manual at 31 (emphasis added). This general goal and the level of barrier removal required is illustrated by the kinds of removal activity envisioned by the Department of Justice, the agency with ADA oversight responsibly. What the Department envisions is required of existing facilities is minimal, and illustrated in its list of "21 examples of modifications that may be readily achievable." This list is:

1. Installing ramps;
2. Making curb cuts in sidewalks and entrances;
3. Repositioning shelves;

---

26. For these same reasons, Defendant is entitled to summary judgment on Plaintiffs' claim under the Rehabilitation Act, 29 U.S.C. §§ 701–797. Summary judgment on this claim also should be granted because Plaintiffs have failed to present any evidence that The Fox receives Federal financial assistance as required to sustain a claim under the Rehabilitation Act. *See* 29 U.S.C. § 794.

4. Rearranging tables, chairs, vending machines, display racks, and other furniture;

5. Repositioning telephones;

6. Adding raised markings on elevator control buttons;

7. Installing flashing alarm lights;

8. Widening doors;

9. Installing offset hinges to widen doorways;

10. Eliminating a turnstile or providing an alternative accessible path;

11. Installing accessible door hardware;

12. Installing grab bars in toilet stalls;

13. Rearranging toilet partitions to increase maneuvering space;

14. Installing lavatory pipes under sinks to prevent burns;

15. Installing a raised toilet seat;

16. Installing a full-length bathroom mirror;

17. Repositioning the paper towel dispenser in a bathroom;

18. Creating designated accessible parking spaces;

19. Installing an accessible paper cup dispenser at an existing inaccessible water fountain;

20. Removing high pile, low density carpeting; or

21. Installing vehicle hand controls.

Technical Assistance Manual at 32–33. The common character of each of these examples is that the public accommodation is required to enhance minimally its existing facility.[27] It is not required to modify, expand, change or rearrange it. This theme is confirmed in the illustrations the Department provides to explain the con-

tours of the ADA requirements on existing public facilities. Two examples include:

> The installation of a platform lift in an historic facility that is preserved because of its unique place in American architecture, or because it is one of few surviving examples of the architecture of a particular period, would not be readily achievable, if the installation of the lift would threaten or destroy architecturally significant elements of the building.

> CDE convenience store determines that it would be inexpensive to remove shelves to provide access to wheelchair users throughout the store. However, this change would result in a significant loss of selling space that would have an adverse effect on its business. In this case, the removal of the shelves is not readily achievable and, thus, is not required by the ADA.

*Id.* at 33–34. The import of these examples is that the cost of removal and its economic impact are separate and independent factors and are critical to the evaluation of whether a removal proposal is readily achievable.

The Department also provides specific guidance on what is required in those public accommodations, like theaters, that have public assembly or seating areas. An existing facility simply is required to "locate seating for individuals who use wheelchairs so that it—

1) Is dispersed throughout the seating area;

2) Provides lines of sight and choices of admission prices comparable to those offered to the general public;

---

**27.** What is required must be economically reasonable also. Immediately following the list of examples, the Department provides this qualification: "Businesses such as restaurants may need to rearrange tables and department stores may need to adjust their layout of racks and shelves in order to permit wheelchair access, *but they are not required to do so if it would result in a significant loss of selling or serving space.*" Technical Assistance Manual at 33 (emphasis added).

3) Adjoins an accessible route for emergency egress; and

4) Permits people who use wheelchairs to sit with their friends or family. *Id.* at 36–37. To meet this fourth requirement, the Department observes that where it is "not readily achievable . . . to remove seats to allow individuals who use wheelchairs to sit next to accompanying family members or friends, . . . portable chairs or other means" may be provided instead. *Id.* The Court finds the undisputed evidence shows a reasonable jury could only conclude that Defendant has met its obligations in the seating, restroom, concession area and ticket-sale facilities it provides.

In this case, the facts are undisputed that The Fox made a number of changes in its facility to enable wheelchair patrons seating, access to concessions stands, access to restrooms and seat price options. The Court finds further, based on the undisputed facts in this case and viewing the evidence in the light most favorable to the Plaintiffs, that a rational trier of fact could not find Defendant, in this existing facility, violated the ADA. Thus, summary judgment in favor of Defendant is appropriate. Using the Standards as a guide, the undisputed facts show The Fox met its obligations under the ADA.

While the Court finds Defendant has done enough to comply with the ADA, it is disappointing that this grand and unique theater is satisfied in meeting its minimum obligations under the ADA. The Fox exists today because the public undertook to ensure its survival. It was the citizens of Atlanta who saved The Fox because they wanted to preserve a precious city treasure. The Atlanta community comes to the Fox in many ways, including by wheelchairs. All citizens would hope that The Fox will look carefully at the special role it plays in the Atlanta community and work hard to ensure that all Atlantans, the able bodied and the disabled, those who walk and those who wheel, can enjoy comparable entertainment experiences in this remarkable facility. It is what this community expects from the stewards of this historically special venue.

## IV. CONCLUSION

Based on the foregoing, the Court finds that Plaintiffs failed to meet their burden of production to show there exists at The Fox architectural barriers that the removal of which are readily achievable. The undisputed facts further show that Defendant made modifications to and accommodations at The Fox for wheelchair patrons consistent with the ADA requirements for existing facilities and that summary judgment in this case is appropriate. Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Leave to File Confidential Statement of Additional Facts in Dispute Under Seal is **DENIED** and Plaintiffs' Motion to Supplement Expert Report of James L.E. Terry is **GRANTED.**[28]

**SO ORDERED.**

---

**28.** Defendant did not file a response to this motion and under Local Rule 7.1(B) it is deemed unopposed.